[Crim. No. 12165.   Second Dist., Div. Five.   July 26, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. JACK RAY HOXIE, Defendant and Appellant.

Ned R. Nelson for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Elizabeth Miller and Jerold A. Prod, Deputy Attorneys General, for Plaintiff and Respondent.

KAUS, P. J.—Defendant pleaded "not guilty" and "not guilty by reason of insanity" to an information charging him with three violations of section 217 (assault with intent to commit murder) of the Penal Code. After a nonjury trial he was found guilty and legally sane at the time of the commission of the offenses.

On appeal the only contention made by privately retained counsel is that the evidence does not support the implied finding that defendant had the mental capacity to intend to commit murder. Defendant has filed a supplemental brief in propria persona in which he contends that the evidence showed, as a matter of law, that he was insane at the time of the commission of the offenses and at his trial.

The evidence is grotesque. On the day of the alleged crimes, September 10, 1965, defendant, who lived without family in a single-family residence located in a highly respectable neighborhood, got into some kind of argument with a young man whom he had recently hired as a chauffeur. The young man

wanted to leave, defendant wanted him to stay. A shotgun blast fired by defendant brought the police to the home. Defendant had several weapons in the house, by the use of which he prevented his arrest for several hours. One officer who did enter the house was shot inside the premises, two others were shot while they were on the street. These three shots formed the basis for the charge. Eventually, aided by the use of tear gas, the police managed to arrest defendant. During the siege he had answered two telephone calls. One was by Officer Schwarz. The conversation went as follows. Schwarz: "I'm Sergeant Schwarz from the Los Angeles Police Department. You don't want to hurt anybody else, do you?" Defendant: "No." Schwarz: "Why don't you lay down your gun and come on outside?" Defendant: "If I do, you will arrest me, and I can't stand going to jail. I can't stand being locked up." Schwarz: "Well, let me come over and discuss it with you." Defendant: "No, you'll lock me up and I can't stand that." After the conversation proceeded for awhile in this vein, defendant put down the receiver.

A second telephone conversation took place between defendant and one Howard Spector, a neighbor. At the request of one of the officers Spector telephoned defendant and said: "Jack you are making quite a disturbance; I'm having a hard time studying." Defendant replied: "Howard, I'd like to talk to you but I'm real busy right now."[1]

█ It is clear from the above synopsis that, testimony concerning defendant's mental capacity or insanity aside, the trial court could find, as it did, that had any of the three victims died, defendant would have been guilty at least of second degree murder. (*Jackson* v. *Superior Court,* 62 Cal.2d 521, 525-526 [42 Cal.Rptr. 838, 399 P.2d 374].) █ *People* v. *Bernard,* 28 Cal.2d 207, 214 [169 P.2d 636] is authority for the proposition that the "murder" which the defendant must intend to be guilty of a violation of section 217 of the Penal Code need only be murder in the second degree. (*People* v. *Butts,* 236 Cal.App.2d 817 [46 Cal.Rptr. 362].)[2]

---

[1]The house was being beseiged by 40 to 50 officers. Between 300 and 500 rounds of ammunition were expended. Eventually 26 rounds of tear gas ammunition were fired.

[2]In *People* v. *Butts, supra,* the court refers to several California authorities holding that a conviction under section 217 of the Penal Code requires proof of specific intent to kill. For the purpose of its opinion the court does not accept an argument, advanced by the Attorney General, that the "murder" referred to in section 217 may include a murder in the second degree which does not involve a specific intent to kill, though malice aforethought is present. (Cf. *People* v. *Conley,* 64 Cal.2d 310, 321-

The major portion of the trial was devoted to testimony relevant to defendant's sanity and his capacity to form the specific intent essential to a conviction. Such testimony came from 10 lay witnesses, all of whom testified for the defense, and four psychiatrists who were evenly divided on the question of defendant's insanity at the time of the commission of the offense. As will be seen, however, only one of the psychiatrists was asked—and answered—the question so vital to a determination of the issue of "diminished capacity" (*People* v. *Anderson,* 63 Cal.2d 351, 364 [46 Cal.Rptr. 763, 406 P.2d 43]), namely whether defendant had a healthy, normal, and *mature* mental state. (*People* v. *Goedecke,* 65 Cal.2d 850, 856 [56 Cal.Rptr. 625, 423 P.2d 777] ; *People* v. *Nicolaus,* 65 Cal.2d 866, 878 [56 Cal.Rptr. 635, 423 P.2d 787] ; *People* v. *Wolff,* 61 Cal.2d 795, 822 [40 Cal.Rptr. 271, 394 P.2d 959].) This question a psychiatrist called by the People answered in the negative.

### The Lay Testimony.

There is no need to set forth the testimony of the lay witnesses in elaborate detail. It came from so many persons whose credibility was unimpeached that we assume that it was believed.[3] It may be summarized as follows: During the three-month period before the shooting defendant demonstrated a profound change in his relationship to his environment. He became obsessed with guns and the idea that if someone approached the window in his house he would be shot at. He would pace back and forth in the home, gun in hand. He would carry a gun when he went shopping. He ceased to care about his appearance, went about unshaven, with his pants not pressed. This was a complete reversal from his former habits. It was impossible to carry on a conversation with him, he would just talk to himself. He became obsessed with the idea that a neighbor, a Doctor Manley, and other neighbors were conspiring against him, had hired others to do him physical harm and had hired men to ride by his home in automobiles. He was convinced that his telephone was tapped. "These people," he thought, were trying to kill him and had

---

323 [49 Cal.Rptr. 815, 411 P.2d 911].) We too find it difficult to digest the concept that a defendant can intend the type of murder in the second degree which does not involve the kind of malice aforethought which consists of "a deliberate intention unlawfully to take away the life of a fellow creature."

[3]Whether or not it amounted to conclusive proof of legal insanity or diminished capacity is quite another matter.

fooled with the brakes on his car so it would jump a 6-foot wall to kill him. He thought that Doctor Manley was somehow in league with the police and that the police were going to come and get him.

At one point defendant was arrested for carrying a concealed weapon and when his attorney came to see him in jail he carried on a ''tirade concerning the alleged mistreatment by the police.'' He described the officers as brutal, uneducated, crude and uncouth. He considered policemen as inferiors, gestapo-like characters. The attorney was unable to substantiate his client's charges against the police.

Doctor Manley testified that none of defendant's fears had any basis in fact. On several occasions the police had been called by him when defendant, at all hours of the night, sometimes accompanied by others, had come to his house threatening to ''fix'' him.

### Defendant's Expert Testimony.

*Doctor Seymour Pollock—direct examination*: Before testifying the doctor spent about five hours with defendant. He reviewed the medical history provided by Doctor Hacker and the reports of Doctors Thompson and Abe. He also reviewed statements by various witnesses. In his opinion Hoxie ''did not fully understand the nature and quality of his acts at the time of the event on September 10, 1965, or understand their wrongfulness.''

*Cross-examination*: The particular mental illness from which defendant suffered was ''schizophrenic reaction, a psychotic reaction.'' When he was shooting at the officers he knew to a degree that they were police officers ''but did not understand their role, their function, their relationship to him . . .'' He did not appreciate that they had come to take him into custody because he had committed a wrong. He was aware that he was hurting people by his shooting. In talking about the police officers he referred to them mostly as ''men in black.'' Defendant was, in brief, ''misinterpreting'' what was going on. His appreciation of the world about him, of the people and events, was not the kind of understanding that is present in the average reasonable man. He believed there was a plot against him. To him a policeman was not a person protecting him, but someone who had been paid off by the Mafia and was in some way interested in hurting him. ''He didn't see the policemen in the same way that I or another person not suffering from this problem saw the policemen. He

didn't understand them to be a policeman in the same way. And in that sense, what I said was that he didn't understand, he didn't comprehend the nature and quality of what he was doing in actuality or appreciate in actuality the wrongfulness of what he was doing in the light of what I have just said. Because all of these circumstances with which he was involved at the time of the shooting were actually circumstances which, with the culmination of events, misinterpretations, distortions, peculiarities in understanding, distortions in his appreciation of reality, which long antedated this experience of the shooting episode. . . . The neighborhood was filled with dope fiends and hopheads. They were all either homosexuals who were involved with plots together and against him. Some were for him, some were against him. And it was a very confused situation. . . .''

*Redirect examination*: The witness did not think that Hoxie had feigned insanity when he interviewed him, *but suspected that he was feigning sanity at the trial.*

*Doctor Frederick Hacker—direct examination*: He had first seen Hoxie in a professional capacity in 1951. His mental condition had become an issue at that time because he had taken two shots at his father. Hoxie had been under the care of Doctor Hacker and his staff, off and on from 1951 until March 1965. In July 1965 Doctor Hacker saw Hoxie at the St. Francis Hospital. Within two weeks after the shooting he saw him again on four different occasions. In the doctor's opinion Hoxie was ''laboring under a number of delusions and hallucinations, and was totally incapable of appreciating the nature and consequences of his acts.''

*Cross-examination*: He had formed an opinion that Hoxie was ''highly upset, psychotic and dangerous'' in July 1965 and so reported to Hoxie's attorney. He advised commitment, but did not determine whether the attorney had acted on his advice. He himself took no steps to commit Hoxie. His diagnosis of Hoxie was ''schizophrenic reaction, paranoid type.'' He was suffering from delusions ''just like the original M'Naughten.'' Just because an individual suffers from paranoid schizophrenia does not necessarily mean that he is unaware of the nature and consequences of his acts. Whether or not such an individual is legally insane *depends on whether his delusions refer to his act.*

*People's Expert Testimony.*

*Doctor George N. Thompson—direct examination*: He

examined Hoxie on November 8, 1965, and came to the conclusion that on September 10 Hoxie had known that his acts were wrong. He also determined that Hoxie was aware that the persons who entered his home and who were at his house were police officers, that he was injuring and shooting police officers and that it was his intent to do so. He could not determine whether at that time Hoxie "knew or believed he could be punished" for his acts. It seemed to the doctor that while Hoxie was aware of the wrongfulness of his acts, he believed that he might have some type of defense so that he would escape punishment. His opinion was fortified when he learned on the stand that during the shooting Hoxie talked to a police officer over the telephone and said that he did not want to hurt anyone else, but did not want to go to jail—could not stand being locked up. This indicated awareness of the wrongfulness of the act.

*Cross-examination*: The doctor's opinion was based on his interview and a study of the transcript of the preliminary examination. The interview lasted over an hour. He too believed that Hoxie suffered from "schizophrenia, paranoid type." It is characteristic of the disease that the patient develops delusions and hallucinations. *"The delusions are quite tightly systematized, usually relating to specific individuals or objects,* and the hallucinations, when they occur— and they do not always occur—usually correspond in nature to the delusions."

When asked in great detail whether he had been made aware of Hoxie's peculiar behavior and statements in the months before the shooting and during the shooting, the witness replied in the negative. Nevertheless these matters would not have altered his opinion, they would have supported it.

*Doctor George Y. Abe—direct examination*: His testimony was based on a single interview with Hoxie on November 29, 1965, plus an examination of the transcript of the preliminary hearing. In his opinion Hoxie appreciated the nature and quality of his acts and knew the difference between right and wrong. He was aware of the fact that his victims were police officers who had gone to his house "in response to their duty."

*Cross-examination*: He too diagnosed Hoxie's illness as a "schizophrenic reaction, paranoid type." There were delusions in regard to Doctor Manley and a Mr. Donahue. His opinion could have been more valid had he been able to

examine Hoxie within two or three days of September 10. He too had not been made aware of many aspects of Hoxie's bizarre behavior before the shooting. Had he known these matters, his opinion would not have changed, except for this: if Hoxie believed that Doctor Manley "had brought the police into this matter as his accomplices" then "there may be a related factor to his present offense." In other words if Hoxie believed that there was this conspiracy between the police and Doctor Manley, that would be "a delusional aspect of his illness connected to the offense" and he would have to reconsider his opinion; but he was unable to find such an aspect at the time of his examination. When Hoxie talked to the witness he said that when the police came he was scared because of prior experience with the police in which he had been mistreated and humiliated. He did not verbalize any connection between Doctor Manley and that experience, which took place in August 1965. He did believe that Doctor Manley had caused him to be arrested in July. *On September 10, 1965, Hoxie did not possess a healthy, normal and mature mental state.* He was suffering from a schizophrenic illness.

*Redirect examination*: Anybody who customarily performs antisocial acts is immature.

## Discussion:

█ If we understand the psychiatric testimony correctly it amounts to this: all four psychiatrists agree that defendant suffered from a mental illness. All were fully aware that mental illness did not automatically amount to legal insanity. There was even a remarkable area of agreement concerning the type of mental illness from which defendant suffered, but the doctors differed in their views concerning the relationship between the illness and the acts done by defendant on September 10, 1965. Doctors Pollock and Hacker thought that in shooting at the police officers defendant acted within the pattern of his delusions—he was protecting himself from those who were persecuting him. On the other hand, Doctors Thompson and Abe—particularly Doctor Thompson—were of the opinion that his resistance to the arrest was not part of the delusional pattern, but that he thought he was doing just what he was doing—resisting an arrest for the perfectly natural reason that he did not want to go to jail. The "tightly systematized" delusions did not cover the shootings.

The trial court chose to go along with the People's experts. We have no right to touch its finding of legal sanity.

The problem posed by the contention in counsel's brief that this court should exercise its powers under section 1181, subdivision 6 of the Penal Code and modify the judgment to assault with a deadly weapon (*People* v. *McCurdy,* 165 Cal. App.2d 592, 595-596 [332 P.2d 350]) is more difficult. The argument is, of course, that the evidence shows as a matter of law that Hoxie, because of mental illness, had diminished capacity to harbor the specific intent to commit murder.

The exact nature of the specific state of mind necessary for murder in either degree—other than felony murder or murder by poison, lying in wait or torture—had been a fuzzy area in our law until the Supreme Court decided *People* v. *Holt,* 25 Cal.2d 59 [153 P.2d 21]. (See Pike, *What is Second Degree Murder in California?* 9 So.Cal.L.Rev. 112.) *Holt* was soon followed by *People* v. *Thomas,* 25 Cal.2d 880 [156 P.2d 7] and *People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8]. In those three decisions the Supreme Court attempted to draw a line between a homicide which follows deliberation and premeditation—murder in the first degree—and a killing preceded merely by a specific intent to kill. For the purposes of this opinion the most significant passage is perhaps one in *People* v. *Thomas* : ''The attorney general contends that 'the presence of proof of specific intent distinguishes murder in the first degree from murder in the second degree. If the proof shows specific intent, it is murder in the first degree, and not murder in the second degree. Specific intent is deliberate intent' and that ''Malice aforethought'' is synonymous with ''deliberation and premeditation,'' citing *People* v. *Watts* (1926) 198 Cal. 776, 800-801 [247 P. 844]. Such contention cannot be sustained. (See *People* v. *Holt* (1944) *supra, ante,* pp. 59, 70, 87, 88.) To support it would belie any difference in the plain import of the words 'specific' and 'deliberate' and would emasculate the statutory difference between first and second degree murder. The word 'specific' (adjective) means 'Precisely formulated or restricted; . . . definite, . . . explicit; of an exact or particular nature' (Webster's New Int. Dict. (2d ed.)) while 'deliberate' (as an adjective) means 'formed, arrived at, or determined upon as a result of careful thought and weighing of considerations; as, a *deliberate* judgment or plan; carried on cooly and steadily, esp. according to a preconceived design; . . . Given to weighing facts and arguments with a view to a choice or decision; careful in considering the consequences of a step; . . . Slow in action; unhurried; . . . Characterized by reflection; dispassionate;

not rash.' (*Id.*) The verb 'deliberate' means 'to weigh in the mind; to consider the reasons for and against; to consider maturely; reflect upon; ponder; as, to *deliberate* a question . . . to weigh the arguments for and against a proposed course of action.' (*Id.*) It has been judicially declared that 'Deliberation means careful consideration and examination of the reasons for and against a choice or measure.' (*People* v. *Richards* (1905) 1 Cal.App. 566, 571 [82 P. 691].)'' (*Ibid.*, pp. 898-899.)

The basic rule enunciated in *Holt-Thomas-Bender* concerning the difference between a specific intent to kill and deliberation and premeditation is as follows: ''The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly, but the express requirement for the concurrence of deliberation and premeditation excludes from murder of the first degree those homicides (not specifically enumerated in the statute) which are the result of mere unconsidered or rash impulse hastily executed.'' (*People* v. *Thomas, supra*, pp. 900-901.)

■ We have already observed that the intended murder leading to guilt under section 217 of the Penal Code need only be murder in the second degree. (*People* v. *Bernard,* 28 Cal.2d 207, 214 [169 P.2d 636].) ■ It was only necessary then that the People prove beyond a reasonable doubt that Hoxie harbored the specific intent to kill. On appeal it is Hoxie's burden to show that in spite of the trial court's resolution of all conflicts in the evidence against him, the undisputed evidence nevertheless shows that he did not have the capacity to formulate such an intent.

■ The defense of diminished capacity is well established in the law of this state. It was first fully recognized in *People* v. *Wells*, 33 Cal.2d 330 [202 P.2d 53], developed in *People* v. *Sanchez*, 35 Cal.2d 522 [219 P.2d 9] and *People* v. *Baker*, 42 Cal.2d 550 [268 P.2d 705], restated in great detail in *People* v. *Gorshen*, 51 Cal.2d 716 [336 P.2d 492], and again recognized in *People* v. *Henderson,* 60 Cal.2d 482 [35 Cal. Rptr. 77, 386 P.2d 677].[4] None of the cases to and including *Henderson* involved the question of modifying a judgment under section 1181, subdivision 6 of the Penal Code. *Wells* dealt with the admissibility of psychiatric evidence to disprove malice aforethought in a prosecution under section 4500

---

[4]It was given its name in *People* v. *Anderson,* 63 Cal.2d 351, 364-365 [46 Cal.Rptr. 763, 406 P.2d 43].

of the Penal Code. The trial court's rejection was held to be erroneous but nonprejudicial.[5] *Sanchez* involved the erroneous refusal to instruct that intoxication could disprove the specific intent involved in robbery and a violation of section 503 (now 10851) of the Vehicle Code. *Baker,* too, dealt with the failure to instruct properly. *Gorshen,* while it contains what is probably the most elaborate explanation of the defense, is at least partly dictum: although the court devotes an extended discussion to the admissibility of expert psychiatric testimony for the purpose of negativing deliberation, premeditation and malice aforethought, the trial court had only accepted that part of the testimony negativing deliberation and premeditation and found Gorshen guilty of second degree murder. The Supreme Court affirmed. Finally, *Henderson,* the last case mentioned so far, also dealt with the erroneous failure to instruct on diminished capacity on the issues of deliberation and premeditation and malice aforethought.

Then came *People* v. *Wolff,* 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959]. In *Wolff* the defendant, then a boy of 15, killed his mother under circumstances from which careful, deliberate planning of some duration could be inferred. The requirements of *Holt, Thomas* and *Bender* appeared to be satisfied many times over. Nevertheless the conviction was reduced to second degree murder. After adverting to *Thomas* and the "true test" announced therein—the *extent* of the reflection—the court said: "In the case now at bench, in the light of defendant's youth and undisputed mental illness, all as shown under the California M'Naughton rule on the trial of the plea of not guilty by reason of insanity, and properly considered by the trial judge in the proceeding to determine the degree of the offense, the true test must include consideration of the somewhat limited extent to which this defendant could *maturely and meaningfully reflect* upon the gravity of his contemplated act. . . . Certainly in the case now at bench the defendant had ample *time* for any normal person to maturely and appreciatively reflect upon his contemplated act and to arrive at a cold deliberate and premeditated conclusion. He did this in a sense—and apparently to the full extent of which he was capable. But, indisputably on the record, this

[5]A companion case decided the same day as *Wells, People* v. *Danielly,* 33 Cal.2d 362 [202 P.2d 18], held that under the facts of that case certain evidence rejected by the trial court did not "tend materially to disprove a specific state of mind essential to the commission of the crimes charged." (*Ibid.,* p. 379.)

defendant was not and is not a fully normal or mature, mentally well person. He knew the difference between right and wrong; he knew that the intended act was wrong and nevertheless carried it out. But the extent of his understand-. ing, reflection upon it and its consequences, with realization of the enormity of the evil, appears to have been materially— as relevant to appraising the quantum of his moral turpitude and depravity—vague and detached. We think that our analysis in *Holt* of the minimum essential elements of first degree murder, especially in respect to the quantum of reflection, comprehension, *and turpitude of the offender,* fits precisely this case: that the use by the Legislature of 'wilful, deliberate, and premeditated' in conjunction indicates its intent to require as an essential element of first degree murder (of that category) substantially more reflection; i.e., more understanding and comprehension of the character of the act than the mere amount of thought necessary to form the intention to kill. . . .'' (*Ibid.,* pp. 821-822.)

*Wolff* was followed by *People* v. *Conley,* 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911], again a reversal based on a failure to instruct properly. Although the earlier cases had left no doubt on that score, *Conley* reaffirms in the strongest terms that diminished capacity is relevant not only on the issues of deliberation and premeditation, but also on the issue of malice aforethought, whether caused by intoxication, trauma or disease.

Finally, within the last year the Supreme Court exercised its power under section 1181, subdivision 6, three times. (*People* v. *Goedecke,* 65 Cal.2d 850 [56 Cal.Rptr. 625, 423 P.2d 777]; *People* v. *Nicolaus,* 65 Cal.2d 866 [56 Cal.Rptr. 635, 423 P.2d 787]; *People* v. *Ford,* 65 Cal.2d 41 [52 Cal.Rptr. 228, 416 P.2d 132].) In each case the jury, following instructions not criticized by the court, found the defendant guilty of first degree murder and imposed the death penalty. In each case the Supreme Court concluded that the psychiatric evidence—conflicting on the question of insanity in *Goedecke* and *Nicolaus*—compelled a modification to second degree murder.[6]

In the case at bar no question of the admissibility of evidence was involved. All relevant evidence was admitted, there were no objections to speak of and the trial court demonstrated an intense interest in the testimony. Since the case

---

[6]In *Ford* the prosecution presented no psychiatric testimony.

914

was tried to the court, there is no problem concerning instructions. Although the argument itself is not reported, the record does show that after it was concluded the judge reread *Wolff* and a case, not identified, in the then advance sheets.[7] ■ We must presume that he correctly instructed himself on the law.

■ The precise line of precedents by which we must be guided, therefore, is not *Wells-Baker-Sanchez-Gorshen-Henderson-Conley* but *Wolff-Ford-Nicolaus-Goedecke*.

For defendant to derive any comfort from the latter line of cases, we would have to go one step further than the Supreme Court has ever gone, for he would not benefit from a holding that the psychiatric testimony compelled a finding that he could not maturely and meaningfully deliberate and premeditate. The record is clear that the trial judge at least assumed that such a finding was appropriate. After argument by counsel he said: ''I am well persuaded here, satisfied beyond a reasonable doubt, that the defendant had sufficient capacity to be guilty of *second degree* murder had one of his victims died.'' (Italics added.)

In none of the cited cases has the Supreme Court told us why it interpreted the psychiatric testimony to prove that, as a matter of law, the defendant did not deliberate and premeditate maturely and meaningfully, but nevertheless was able to harbor malice aforethought.[8]

The problem has been recognized in the literature. In Guttmacher & Weihofen, Psychiatry & The Law (1952) the authors, in discussing the theory now known as diminished capacity, say this: ''A second possible objection to accepting the theory, although it has not been mentioned in any of the cases, is that if the theory is sound at all, it is not limited in application to reducing first-degree murder to second degree, but logically extends to all crimes requiring a specific intent or even general intent, including negligent crimes. Adoption of the rule therefore would involve a radical revision of the

[7]Probably *People* v. *Steele*, 237 Cal.App.2d 182 [46 Cal.Rptr. 704], decided about six weeks before the trial in the case at bar and discussed by the parties and the court at the motion for new trial.

[8]The reduction to second degree murder in *Wolff, Ford, Nicolaus* and *Goedecke* theoretically only implies a finding by the Supreme Court that the respective defendants had the capacity to harbor malice aforethought, a state of mind which does not necessarily include a specific intent to kill. (*People* v. *Conley*, 64 Cal.2d 310, 321-323 [49 Cal.Rptr. 815, 411 P.2d 911].) On the facts of the cases, however, it is hard to see that the malice aforethought consisted of anything but such a specific intent.

law of insanity as a defense to crime, for it would set up a new test of insanity, supplementing and perhaps superseding the established right-and-wrong and irresistible-impulse tests. The new test would be: Was the defendant, at the time of the act charged as criminal, suffering from mental disorder which prevented his having the *mens rea,* or criminal intent, requisite to constitute the crime? This is in effect the present New Hampshire rule and has at times been proposed as a substitute for the more generally accepted test, though without success.

"As a practical matter, the suggestion that adoption of the theory would open up a new test of insanity is not very alarming, for it could have little effect beyond reducing first-degree murder to second degree or perhaps to involuntary manslaughter where the mental disorder negatived the malice aforethought essential to murder. In most other situations the new rule would be largely coextensive with the right-and-wrong test, for a person who lacks the requisite criminal intent because of mental disorder can probably also be said to lack comprehension of the nature and quality of the act or that it was wrong. In 1949 the California Supreme Court in an important case accepted the theory where malice aforethought was involved, and stated that it would apply to any situation where a particular mental state is an essential element of a crime." (*Ibid.,* pp. 431-433. Footnotes omitted.)[9]

We frankly do not know the precise reason why the Supreme Court has apparently drawn a line between deliberation and premeditation and malice aforethought. To be sure the *Holt-Thomas-Bender* trilogy described in great detail the state of mind necessary before a finding of deliberation and premeditation is justified. It is therefore a good deal easier to find as a matter of law that a person who suffers from mental sickness cannot attain that mental state. Thus in *Goedecke* the court said: ". . . as in *Wolff,* it appears from the record that although defendant knew the difference between right and wrong and that the intended act was wrong, the extent of his understanding, his reflection upon it, and its consequences, with realization of the enormity of the evil, was materially vague and detached and fell short of the minimum essential elements of first degree murder, especially in respect to the quantum of reflection, comprehension and turpitude of the offender. . . ." (*Ibid.,* p. 933.) It is far more difficult to say as a matter of law that mental sickness makes a defendant

---

[9]The California case referred to is *People* v. *Wells, supra.*

incapable of harboring the mere intent to kill. Since such a bare intent need not be clothed with the specific qualities peculiar to deliberation and premeditation, there is less opportunity for mental sickness to affect it.

Yet a finding that mental sickness prevents mature and meaningful deliberation and premeditation certainly does not exclude a further finding that it also affects the intent to kill to such an extent that even a conviction of second degree murder must be modified or set aside altogether. The cases reversing convictions for inadequate instructions demonstrate that the jury must be given an opportunity to reach a verdict which does not imply the finding of any specific intent.

The reason for the Supreme Court's obvious reluctance to go further under section 1181, subdivision 6 cannot be that none of the defendants asked for more than they got: we have examined the written record in all four cases and it appears that in at least one of them—*Goedecke*—defendant did not even suggest a modification under the section, but sought reversal on other grounds. Thus, since the Supreme Court apparently acted on its own initiative, it surely would have gone further had it thought it was appropriate to do so.

The exact reason why undisputed mental illness appears to negative deliberation and premeditation as a matter of law, but does not so affect a less complex specific intent, will have to be stated by the Supreme Court. On our part, we are satisfied that, had defendant killed one of his victims and been convicted of second degree murder, the Supreme Court would not modify the judgment.

The last contention is again defendant's own: that he was insane at the time of the trial, a contention which, we assume, includes a subsidiary point: that, at least, there should have been a hearing on his present sanity. He could not have known when he filed his own brief on April 13, 1967 that this then apparently frivolous point would gain some stature two weeks later when the Supreme Court filed *People* v. *Pennington,* 66 Cal.2d 508 [58 Cal.Rptr. 374, 426 P.2d 942]. Nevertheless we are persuaded that the point has no merit.

There are altogether three isolated references in the record to defendant's sanity at the time of the trial: the first is Doctor Pollock's statement that he suspected that Hoxie was ''feigning sanity now.'' The second is a statement by the trial court after a brief discussion of his findings on defendant's mental capacity: ''I'm also persuaded that he is not legally insane within the meaning of the criminal law. He is

found guilty of each of the charges and found sane." The third is the minute order for that day which reads in part as follows: "The court finds defendant to be legally sane at the time of the offense *and at the present time.*"

In *People* v. *Pennington, supra,* defendant had pleaded not guilty and not guilty by reason of insanity. During the early stages of the trial defendant started to interrupt the proceedings in various ways. Twelve days after the start of the trial defense counsel moved for a hearing on the issue of Pennington's present sanity under the provisions of section 1368 of the Penal Code. In support of that motion he submitted the affidavit of a clinical psychologist who had examined Pennington and in whose opinion he was then insane. Defense counsel also represented to the court that Pennington was unable to cooperate with him. During the argument on the motion Pennington again interrupted the proceedings and had to be gagged. The motion was denied. On the following day defense counsel offered more evidence of Pennington's present insanity. The court announced that it had no doubt of defendant's sanity and that it had reached this lack of doubt on the basis of its own observations and the reports of four court-appointed psychiatrists.

Under the compulsion of *Pate* v. *Robinson,* 383 U.S. 375 [15 L.Ed.2d 815, 86 S.Ct. 836], our Supreme Court overruled *People* v. *Merkouris,* 52 Cal.2d 672 [344 P.2d 1] and held that the trial judge was no longer permitted to resolve conflicting evidence against the harboring of a doubt. "*Pate* v. *Robinson* stands for the proposition that an accused has a constitutional right to a hearing on present sanity if he comes forward with substantial evidence that he is incapable, because of mental illness, of understanding the nature of the proceedings against him or of assisting in his defense. Once such substantial evidence appears, a doubt as to the sanity of the accused exists, no matter how persuasive other evidence—testimony of prosecution witnesses or the court's own observations of the accused—may be to the contrary.

"When the evidence casting doubt on an accused's present sanity is less than substantial, *People* v. *Merkouris, supra,* 52 Cal.2d 672, 678-679, correctly states the rules for application of section 1368 of the Penal Code. Whether to order a present sanity hearing is for the discretion of the trial judge, and only where a doubt as to sanity may be said to appear as a matter of law or where there is an abuse of discretion may the trial judge's determination be disturbed

on appeal. But, when defendant has come forward with substantial evidence of present mental incompetence, he is entitled to a section 1368 hearing as a matter of right under *Pate* v. *Robinson, supra,* 383 U.S. 375. The judge then has no discretion to exercise. . . .'' (*Ibid.,* p. 518.)

■ In the case at bar all we have is Doctor Pollock's answer. That answer was obviously not directed to the relevant criterion under section 1368 of the Penal Code, that is to say whether Hoxie was able to understand the nature and purpose of the proceedings taken against him and to assist counsel in the conduct of a defense in a rational manner. (*People* v. *Pennington, supra; People* v. *Brock,* 57 Cal.2d 644, 648-649 [21 Cal.Rptr. 560, 371 P.2d 296].) That test is quite different from that under the M'Naughton rule to which the doctor was addressing himself. (*People* v. *Brock, supra,* p. 648.)

At his trial defendant was represented by prominent, privately retained counsel who at no time raised any question of defendant's ability to understand what was going on and to assist in the conduct of the defense. The evidence of insanity at the time of trial was not substantial.

The judgment is affirmed.

Hufstedler, J., and Stephens, J., concurred.