[Crim. No. 14529.   Second Dist., Div. Five.   Mar. 5, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. CHARLES ROBERT DORSEY, Defendant and Appellant.

424

Richard H. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Edward M. Belasco, Deputy Attorneys General, for Plaintiff and Respondent.

KAUS, P. J.—After a court trial defendant was convicted of assault with intent to commit murder. (Pen. Code, § 217.) He appeals.

### FACTS

The victim of the alleged crime was one Ernest E. Lee. He testified as follows: at 7 p.m. on February 10, 1967, he walked into a liquor store at Fifty-first and Avalon. Defendant came in and accused him of making a statement to his wife. It was fairly light outside.[1] He could not recall having been with the defendant just before then, or having seen him in the area. Lee asked defendant who his wife was. He had seen defendant before, but did not know him personally. Defendant said:

---

[1] We can take judicial notice that the witness must have been mistaken.

"You're not going any place." Defendant then started a fight in the course of which he stabbed Lee twice in the intestinal area. Lee's "stomach was laid wide open." It took 28 stitches to sew up the wounds. Lee apparently received the first stab wound inside of the store. The fight then moved outside, where Lee was stabbed again. After he was stabbed Lee ran to a filling station and asked one of the attendants to call an ambulance. Defendant did not pursue him. Lee stayed at the General Hospital for about a week. Lee had been drinking at the time of the incident. He had seen a woman by the name of Estelle Bryan "around" before the fight but did not know her personally. He had not had a conversation with her in the liquor store, although she might have said "hello" to him there. He paid no attention. Miss Bryan did not call him Maurice, nor was he known as Miss Lee. He never told her any such thing. He did not try to kiss defendant in the liquor store and had never kissed him in the past. He had not been making homosexual advances to defendant.

Miss Bryan testified for the People that she had known Lee for almost 20 years. On February 10 she and defendant had been living together for 18 months. She knew Lee as "Maurice" and as "Miss Lee." Lee had told her that those were his names, that he was a "Lesbian [*sic*] and a prostitute" and that he wanted a man.[2] On February 10 she was not in the liquor store but at the service station in the parking lot for the liquor store. She spoke to "him" and "he" never spoke to her. "He" rode in her car and had been around her. She was not talking about the defendant but about "him," whom she knew before she knew defendant. They had been out to parties. Lee did not tell her that his name was Maurice or Miss Lee on February 10, since defendant did not permit her to go to the parking lot. So there she was in the parking lot on February 10,[3] where she saw an altercation between defendant and Lee. Defendant had come and told her that there was company at home "and he made advances to kiss her

---

[2]The time of this alleged request was not nailed down. Our summary of Miss Bryan's testimony is just as confusing as it appears in the record. It is a pity that the prosecutor hardly ever tried to get her to clarify her nonresponsive, improbable and inconsistent answers. Perhaps, having realized that calling Miss Bryan had been a ghastly mistake, he did not want to do anything to spoil the dreamlike quality of her testimony.

[3]"Q. Did he tell you that on this date? A. Oh, no, not on the 10th of February, as Mr. Dorsey didn't allow me to go to the parking lot. Q. Did you go into the liquor store on this occasion? A. No, I was out on the parking lot."

[?] . . ." and then Miss Lee said "Here comes my man now." He also said he was pregnant. Lee then tried to kiss defendant. Miss Bryan then went home, having told defendant to stay with Lee. She had seen activity between Lee and defendant on previous occasions, but did not see anyone injured on February 10, because she was not there, she was at home. When she saw Lee at 7 p.m. he was drinking a half pint of whiskey but he did not get stabbed then. He was stabbed at nighttime.

Cross-examination of Miss Bryan confused matters even further: when she went to parties with Lee he always called her Jane Wyman. He did not look like a lady. She had another husband. On February 10 Lee was drunk. In her conversation with Lee she asked him why he refused to speak to her. It was then that he informed her of his delicate condition. After that defendant arrived, Lee tried to kiss him and she left. The stabbing took place much later, but she did not see it.

At this point during the cross-examination defense counsel asked Miss Bryan: "Q. Do you personally know what the relationship was between Lee and Dorsey or what it was before this afternoon?" An objection, based solely on irrelevancy, was sustained and the witness was excused.

Defendant testified in his own defense. In the late afternoon or early evening of February 10, after he had taken Miss Bryan home following Lee's attempt to kiss him on the parking lot, he was talking to a "gang" consisting of Raymond La Blonk and Snootz. Before then he had told "Miss Lee" twice to stay away from him because he was married, had three children and had never indulged in "such loving."[4] Lee then came up to him again and tried to embrace him. Defendant fought off his advances. Lee hit him in the mouth, knocking out his bridge. Lee then reached for defendant's pocket. Defendant had a small penknife in his possession. Trying to defend himself he stabbed Lee twice. He then went home. "Upon arrival Estelle asked me what happened and I told her that Lee had been molesting me and Estelle Bryan and her daughter approximately a month and I told him to stay away from me and he said that whatever he wanted he got it or words to that effect."[5] Defendant merely wanted

---

[4]About a month earlier he had met Lee in a restroom and had been subjected to an indecent advance.

[5]In fairness to Miss Bryan and defendant, it must be stated that some, though by no means all, of the inconsistencies and improbabilities in

Lee to stay away from him and his wife. He had prior knowledge that Lee was carrying a gun and did not want to take any chances. The fight occurred at about 10 p.m., defendant having been away from the scene for about two hours after Lee first tried to kiss him on that day. The fight was preceded by a second amorous advance.

## DISCUSSION

On appeal we are urged to find that the testimony of the victim was so completely discredited by Miss Bryan and defendant that it cannot support the conviction. This contention must founder, as it usually does, on the substantial evidence rule. Miss Bryan was a most unsatisfactory witness and defendant's interest in the outcome of the proceedings was obvious. While it seems quite probable that Lee's version of the facts, particularly his lack of prior acquaintance with defendant and Miss Bryan, may not be the whole truth, we cannot set aside the court's implied finding that the defendant, and not Lee, was the aggressor in the fight.

As far as the ruling sustaining the prosecution objection to the question concerning the relationship between Lee and defendant is concerned, there was error. Its relevancy is obvious. (Evid. Code, § 351.) The court's ruling did not purport to be based on its discretion to exclude relevant evidence under the provisions of section 352 of the Evidence Code. Yet it is difficult to conclude that defendant was prejudiced by the ruling. Both through Miss Bryan's and his own testimony defendant developed fully that in the past Lee had attempted to involve him in a homosexual relationship, which past attempts made defendant's version of the events leading up to the fight that much more probable. Since, presumably, this is all that the excluded testimony was designed to show, it would just have been cumulative. The error was not prejudicial. (*People* v. *Kendrick,* 56 Cal.2d 71, 88-89 [14 Cal.Rptr. 13, 363 P.2d 13]; *People* v. *Brust,* 47 Cal.2d 776, 785-786 [306 P.2d 480].)

Defendant claims that there was no proof of a specific intent to kill Lee. While the evidence admits conflicting

their testimony may be explained by the fact that witnesses do not supply their own punctuation. Reporting is therefore, to some extent, interpretative. For example, as reported, the above quote contains the improbable statement that defendant told Miss Bryan that Lee had been molesting her—something which should not have escaped her attention. What defendant could have said was: "Upon arrival Estelle asked me what happened, and I told her. Lee had been molesting me and Estelle Bryan . . ."

inferences concerning defendant's intent, we cannot say that the implied finding lacks evidentiary support. ■ "A specific intent to commit murder is a factual determination to be made by the jury (*People* v. *Hillery,* 62 Cal.2d 692 [44 Cal. Rptr. 30, 401 P.2d 382]). ■ Furthermore, this intent is rarely susceptible to direct proof; it must be inferred from the facts and circumstances surrounding the act. (*People* v. *Lyles,* 156 Cal.App.2d 482 [319 P.2d 745]). Thus, the nature of the assault, especially the weapon used and the nature, seriousness and location of the wound, as well as the consequences likely to follow, are among the circumstances that may support a finding that an assault was made with an intent to commit murder (*People* v. *Becerra,* 223 Cal.App.2d 448 [35 Cal.Rptr. 808]; *People* v. *Logan,* 244 Cal.App.2d 795 [53 Cal.Rptr. 549])." (*People* v. *Dick,* 260 Cal.App.2d 369, 371 [66 Cal.Rptr. 891].) ■ The fact that defendant did not follow up his assault to make certain the victim died, does not conclusively disprove an earlier intent to kill.

The Attorney General cites *People* v. *Logan,* 244 Cal.App. 2d 795, 798 [53 Cal.Rptr. 549] as standing for the proposition that a callous indifference to human life is all that section 217 of the Penal Code requires by way of a specific intent. Since, in our opinion, there was some evidence from which the trial court could infer a specific intent to kill, it is unnecessary to decide whether *Logan* modifies the law as declared in *People* v. *Mize,* 80 Cal. 41, 43 [22 P. 80]. (See *People* v. *Butts,* 236 Cal.App.2d 817, 827-828 [46 Cal.Rptr. 362]; cf. *People* v. *Hoxie,* 252 Cal.App.2d 901, 904, fn. 2 [61 Cal.Rptr. 37].)

■ Finally, defendant claims that the proof of venue was inadequate.

The victim testified that he lived at 4421 Naomi in Los Angeles. All witnesses agreed that the incident happened at the intersection of Fifty-first and Avalon. We take judicial notice that there is such an intersection in Los Angeles County. (*People* v. *Hosney,* 204 Cal.App.2d 584, 587 [22 Cal. Rptr. 397]; cf. *Varcoe* v. *Lee,* 180 Cal. 338, 346-347 [181 P. 223].) ■ The prosecution's burden to lay venue is, of course, satisfied by a mere preponderance of the evidence. (*People* v. *Cavanaugh,* 44 Cal.2d 252, 262 [282 P.2d 53]; *People* v. *Megladdery,* 40 Cal.App.2d 748, 764 [106 P.2d 84].) The judgment is affirmed.

Aiso, J., and Reppy, J., concurred.

A petition for a rehearing was denied March 11, 1969.