[Crim. No. 14991.   Second Dist., Div. Five.   Sept. 16, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. CHARLES OMAR BENNETT, Defendant and Appellant.

Myron Wigderson for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Robert P. Samoian and Frederick R. Millar, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

KAUS, P. J.—A jury convicted defendant of having violated section 12021 of the Penal Code (possession of conceala-

ble firearm by a former felon). Sentenced to prison, defendant appeals from the judgment.

The firearm in question was a .38 revolver, the property of Officer R., then a member of the police department of one of the smaller cities in Los Angeles County. Though married, Officer R. was an extremely close friend of defendant's sister whose car he used when he and the sister went out together. Occasionally, R. had the weapon along when he used the sister's car.

Defendant was charged with a violation of section 12021 when, during a routine traffic stop on September 18, 1967, a highway patrol officer found the gun under the left front seat of the sister's car which defendant had been driving. It was fully loaded.[1]

The prosecution's theory was that defendant had stolen the gun and was in knowing possession at the time of his arrest. The defense was that defendant was unaware of the presence of the weapon which, somehow, must have been placed in the car by Officer R.

Officer R. testified that on July 20, 1967, he left the gun in the locked glove compartment of his own car. About two weeks later he opened the glove compartment. The gun was missing. A small hole had been cut into the cardboard bottom of the glove compartment. It was big enough to "sort of wriggle" a hand through.

Incredibly R. did not report the theft until after he was advised of defendant's arrest. His explanation for this failure was that he had tried to retrace his steps during the two weeks' period between July 20 and the discovery of the loss.[2] Another reason was that he suspected defendant of being the thief.

To buttress his theory that Officer R. must have left the gun in the sister's car, defendant attempted to show that the officer was a heavy drinker and consumer of "bennies" and other "narcotic type pills." The theory of the offered evidence was that the officer could have placed the gun where it was eventually found in an "alcoholic or narcotic stupor"

---

[1] The gun was apparently well hidden, because it was not discovered until one of the officers made a complete inventory of the vehicle. This inventory was necessitated by the fact that after the routine traffic stop it was ascertained that there was an outstanding warrant against the defendant.

[2] "Retrace them in my mind only, places I had been, trying to recall where I had been, what I had done. I finally realized that in a two-week period I could have been most anywhere."

and forgotten about it. That this was more than idle speculation is evident. If Officer R. was certain that he had not removed the gun during the critical two-week period, his explanation that he failed to report the loss while he was mentally retracing his steps would have been nonsense.

The attempt to establish R.'s habits with respect to alcohol and pills was made twice during the cross-examination of the officer,[3] once during the re-direct examination of a witness who described herself as defendant's "common law wife"[4] and finally by an elaborate offer of proof. This offer related to testimony counsel expected from the "next witness" an otherwise unidentified woman. The prosecutor's objection to her testimony was sustained. The witness was never called. The proceedings are set forth in the footnote.[5] We think defendant adequately complied with section 354 of the Evidence Code. The "substance, purpose and relevance of the excluded evidence was made known to the court" by the questions

---

[3] After the People's objection to one of the defense's questions was sustained, counsel made the following offer of proof: ''. . . Your Honor, I make the offer of proof that this man is a heavy user of 'bennies' and other pills, and I make the offer of proof to show that he is a very heavy drinker and I can place him drunk during that period of time. Now, if he was under the influence of narcotics or under the influence of alcohol there is a question in my mind whether that gun may not have been lost or misplaced. It is entirely different whether it was stolen or lost. It goes to the element of knowledge.''

[4] In fairness to the trial court we note that the question addressed to this witness was improper redirect examination and the objection on that ground was properly sustained.

[5] ''. . . MR. WILSON, Your Honor, the next witness I have would testify that she had seen Fred drunk on many occassions; also the fact that he used pills. MR. VROMAN: It is irrelevant and has no relevancy whatsoever. THE COURT: What pertinency would that have? MR. WILSON: Your Honor, it is my contention you have got an officer here who is sloppy with the use of his off-duty service revolver and it's my guess that what happened is that this gun was placed on the seat by somebody at some time—I think it is fair to say it was probably the officer when he got either in one of his alcoholic or narcotic stupors and he slipped it under the seat and forgot about it. MR. VROMAN: Well, we are not trying this case on counsel's guesses or surmises. THE COURT: Does this testimony relate to any particular thing, any particular date? MR. WILSON: I can probably tie it down, your Honor, to seeing him drunk, and so on and so forth. It certainly shows a pattern on his behalf. This is not the best officer in the world. MR. VROMAN: Well, the officer isn't on trial. It is the defendant, your client, that is on trial, and I can't see any materiality as to what that officer—he may drink heavily, certainly, but what materiality or relevancy it has that your client had this weapon in his possession — THE COURT: I take it you don't have any evidence at any time while he was under the influence of either drugs or alcohol that he did in fact put this gun — MR. WILSON: No, I don't, but I think it is an inference reasonable to draw. MR. VROMAN: It is too remote. THE COURT: Well, I don't believe under your offer of proof it has any relevance. The objection to the offered evidence will be sustained.''

asked and the offer of proof. Furthermore, the court's flat statement that the evidence had no relevance made further compliance with the requirements of subdivision (a) of section 354 futile. (Evid. Code, § 354 subd. (b).)

Section 1105 of the Evidence Code reads as follows: "Any otherwise admissible evidence of habit or custom is admissible to prove conduct on a specified occasion in conformity with the habit or custom." The "specified occasion" in which we are interested is the two-week period after July 20. It is quite clear from the offers made by defendant that he thought he could prove a habit of drinking and pill taking sufficiently regular so that there should have been several occasions during that period when Officer R.'s condition would cause him not to remember all of his actions.

Although there appears to be considerable conflict with respect to the admissibility of habitual drinking to prove intoxication at a particular time (1 Wigmore, Evidence (3d ed. 1940) § 96 fn. 1), there are at least two California decisions permitting such evidence. In *Cosgrove* v. *Pitman,* 103 Cal. 268 [37 P. 232], the Supreme Court said that intoxication at the time of an accident could be inferred from a showing of a habit of intemperance "at or about the time of the accident."[6] In *Kovacs* v. *Sturgeon,* 274 Cal.App.2d 478, 485-487 [79 Cal.Rptr. 426] it was held that the trial court had properly admitted evidence of the plaintiff's drinking habits, as there was some showing that plaintiff had been drinking immediately before the accident. In so holding the court distinguished *Wilson* v. *Manduca,* 233 Cal.App.2d 184 [43 Cal.Rptr. 435]. In that case the issue was the genuineness of the plaintiff's purported signature on a deed. The deed in question had allegedly been signed in February 1958. Evidence, held to have been improperly admitted, came from a former coemployee of the plaintiff who testified that "some years before" the plaintiff "appeared to have been drinking in the afternoon." The distinction was based on the fact that in *Wilson* there was no evidence of drinking at the critical time.

■ Obviously defendant's offer of proof was much stronger than the improper evidence in *Wilson.* It was directed to the relevant time period. The Attorney General points to the fact that counsel admitted that he had no evi-

---

[6]The strength of the holding is diluted by the fact that the judgment of the trial court was reversed on the ground that the proof of habitual drinking was insufficient.

dence that the officer placed the gun in the sister's car while under the influence of drugs or alcohol; but if counsel had had such proof, evidence of the officer's habits would have been superfluous. Instead, for what it was worth, counsel wanted to lay the foundation for a permissible inference which, if drawn by the jury, would negative the People's theory that his client stole the gun.[7] He should have been permitted to present his proof.[8]

The jury apparently felt that the case was a close one. It first retired at 10:43 a.m. and did not reach its verdict until 8:57 p.m. A little earlier, at 8:05 p.m. the foreman of the jury had expressed the opinion that there was no reasonable possibility of a verdict being reached that evening. Admission of the rejected evidence could have raised a reasonable doubt. The error was prejudicial.

It is unfortunate that we must reverse, for we do not really know whether the offered evidence would have lived up to its advance billing. Offers of proof are rarely colored by pessimism. Unnecessary reversals for failure to receive evidence which does not, in fact, exist, can easily be avoided by hearing the offered proof from the witness, under oath. Quite apart from possibly showing that the witness would have had nothing to contribute had the court ruled differently, the impact of the testimony, if the witness does come through, may cause the court to change an erroneous ruling. In federal nonjury trials, such a procedure is required by rule 43(c) of the Federal Rules of Civil Procedure. (See also 9 A.L.R.3d, 508 at p. 509, fn. 1.)

Defendant makes several other contentions. We shall only discuss those that are likely to arise on retrial. He claims that the court erroneously instructed the jury on the law concerning confessions, although there was no evidence of any confession. We need not decide whether defendant is technically correct.[9] The instructions that were given to the jury do not

---

[7] It would not have been necessary for the jury to disbelieve the officer's testimony about the hole in the glove compartment. The officer could have mislaid the gun before the hole was cut.

[8] The court did not purport to act under section 352 of the Evidence Code and the Attorney General does not attempt to justify its rulings on that basis. (*State of Cal.* ex rel. *Dept. of Public Works* v. *Wherity*, 275 Cal.App.2d 241, 250 [79 Cal.Rptr. 591]; *People* v. *Dorsey*, 270 Cal.App. 2d 423, 427 [75 Cal.Rptr. 658]; *Garfield* v. *Russell*, 251 Cal.App.2d 275, 279 [59 Cal.Rptr. 379]; cf. *People* v. *Russel*, 69 Cal.2d 187, 196-197 [70 Cal.Rptr. 210, 443 P.2d 794]; *People* v. *Ford*, 60 Cal.2d 772, 801 [36 Cal. Rptr. 620, 388 P.2d 892].)

[9] The arresting officer testified that defendant had said: "If you are going to make a big deal out of this, I stole the pistol." Defendant

characterize any of defendant's statements as a confession and it is inconceivable that he was prejudiced.

█ The prosecution produced two witnesses who testified that on September 6, 1967, defendant had threatened them with a revolver. They both identified Officer R.'s revolver as being the weapon.[10] On appeal it is argued that the evidence was irrelevant and unduly prejudicial.

The relevance of defendant's possession of the gun on September 6 is, under the circumstances of this case, so obvious that we need not discuss it further.

Turning to the claim of prejudice there is a clear distinction between the naked fact of appellant's possession of the gun and his actions at the time. Strictly speaking only the possession was relevant. Theoretically the trial court could have prevented the prosecutor from going further during the direct examination of his witnesses. As a practical matter it would have been futile to do so, since defendant obviously could not leave their testimony unchallenged and any attempt to discredit or contradict the witnesses would have entitled the prosecutor to develop their entire version of the incident.

---

himself testified as follows: ". . . I turned to the arresting officers and told them—asked him—I said, 'I thought you were going to handle this and take care of it by calling Fred yourself,' and he said at that time he thought so, also, and I made the statement, 'Well, rather than to create an embarrassing position for Officer Fred . . ., due to the fact that I was on parole and an ex-felon and I was afraid due to the circumstances between me, my sister and him, that it would be misconduct on his part, I told him, 'Just arrest me for the gun.' '' After several hours of deliberation the jury requested that the testimony of the arresting officers be reread. The court complied.

[10]Of course, if these witnesses were believed, the question of who removed the revolver from Officer R.'s glove compartment becomes a red herring. Evidently, however, the jury had problems. As noted in the text above it deliberated almost 10 hours. There was plenty of room for doubting the witnesses' version of the incident. They were husband and wife. The husband who identified the gun rather positively, had been previously convicted of possession of narcotics and was on probation at the time of the trial. The wife's identification of the weapon was much less certain. The husband testified that his wife notified the police several hours after the incident. The wife, however, admitted that it was defendant who wanted the police called. Defendant admitted that there had been an altercation with the two witnesses. According to him they were squatting with a tenant in an apartment house he was managing and he was simply ordering them off the premises. He objected to their presence because he had found narcotics paraphernalia in the apartment. He denied having been armed. The wife also claimed that a day or so before the altercation she was standing on a balcony while defendant was washing down his driveway and saw the butt end of a gun sticking out of defendant's trousers. On cross-examination she admitted that at first she did not know it was a gun until a companion told her.

Defendant claims that the prosecutor committed misconduct when he attempted to impeach him by asking about certain felony convictions which he previously suffered. He claims that the attempt was a violation of an understanding that was reached between counsel when defendant, at the outset of the trial, admitted two different felony convictions.

The record shows that there was an obvious misunderstanding between counsel. It is unnecessary to discuss the merits of defendant's claim of prejudice. At a retrial counsel should be more explicit.

The judgment is reversed.

Stephens, J., and Reppy, J., concurred.

A petition for a rehearing was denied October 9, 1969, and the opinion was modified on September 24 and October 9, 1969, to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied November 12, 1969. McComb, J., and Burke, J., were of the opinion that the petition should be granted.