[No. B017032. Second Dist., Div. One. Sept. 30, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH CONRAD HUMPHRIES, Defendant and Appellant.

## COUNSEL

Joseph Shemaria, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, William R. Weisman and Paul C. Ament, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

EPSTEIN, J.*—Joseph Conrad Humphries appeals from the judgment of conviction imposed after his second trial for murder with a special circumstance. We will affirm the judgment.

---

*Assigned by the Chairperson of the Judicial Council.

PROCEDURAL SUMMARY

Theresa Berry was murdered on November 3, 1977. In an information filed the following June, defendant was charged with conspiracy to murder and to rape (Pen. Code, §§ 182/187, 261, subds. (2), (3)), forcible rape, and murder. Three special circumstances were charged with the murder: felony-murder, based on kidnapping and rape, and murder for pecuniary gain. The conspiracy count alleged an unlawful combination to murder in which defendant conspired with Loran Berry and Rene Espinosa. The kidnapping charges (as a substantive crime and as the felony for the felony-murder special circumstance), were dismissed.

The gist of the People's case was that Loran Berry had hired defendant to murder his wife, Theresa Berry, in order to collect insurance under a policy on her life. The insurance proceeds were to be evenly split between Berry and the defendant. Defendant hired Espinosa to help him carry out the murder.

After a four-and-a-half month trial, a mistrial was declared when the jury was unable to reach a verdict. Both the defendant and the prosecution were represented by new counsel at the second trial, which was conducted before a different judge.

Counsel entered into a stipulation at the beginning of the second trial, by which they agreed to be bound by certain rulings made by the judge who had presided over the first trial. The nature and effect of that stipulation are the subject of defendant's principal argument on appeal. Defendant/appellant contends that both counsel agreed to be bound not only by the pretrial, *in limine* rulings of the judge who presided at the first trial, but also by all evidentiary rulings made by that judge during the trial. The respondent argues that the stipulation covered the *in limine* rulings only. We will discuss this issue further in our analysis of defendant's first contention on appeal.

The second trial, which also was before a jury, was conducted in October and November 1981. The jury was unable to reach a verdict on the rape charges, but it convicted defendant of murder with a pecuniary gain special circumstance, and of conspiracy to commit murder. After a brief penalty trial, the jury found in favor of life imprisonment without possibility of parole. The court denied a motion for new trial, and sentenced defendant to life imprisonment without possibility of parole. A sentence of 25 years to life on the conspiracy to murder count was stayed.

FACTUAL SUMMARY

In the following summary, we have taken all factual disputes in the evidence to have been resolved in favor of the judgment. (See *People* v.

*Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; *Jackson* v. *Virginia* (1979) 443 U.S. 307 [61 L.Ed.2d 560, 99 S.Ct. 195].) Further facts pertinent to particular claims of error will be discussed in our treatment of those contentions.

Loran and Theresa Berry had had a troubled marital relationship, marked by separations and occasional physical violence. They also suffered financial difficulties. Mrs. Berry worked as a prostitute.

In May 1976, she purchased a $10,000 life insurance policy. At first, her husband, Loran Berry, was the sole named beneficiary. But she later changed this to designate her father, Adam Steil. Still later she made other changes, adding her daughter as a second beneficiary, then redesignating her husband as first beneficiary. But she excluded him and named her father as the sole beneficiary by a change effected in April 1977, some seven months before her death. Altogether, Loran Berry was a named beneficiary for only about two and a half months.

At some point, Berry decided to have his wife killed in order to collect the insurance on her life. On October 10 or 11, 1977, he asked defendant to kill her in exchange for $5,000, one-half of the insurance proceeds. This proposition was made at the San Bernardino County jail, where the two were incarcerated on outstanding warrants.

Defendant had met Espinosa, then a juvenile, the preceding June and they saw each other frequently after that. Defendant was living in an apartment in Lomita with Cathy Severson[1] and her children. He drove Severson's Cadillac, and whenever defendant and Espinosa went anywhere together, defendant drove the Cadillac.

There were several meetings between defendant and Berry after they were released. Espinosa saw defendant in mid-October, shortly after the release. On that occasion, or shortly thereafter, defendant told Espinosa that he had met Berry while in jail, and that Berry had proposed that defendant do him a "favor," which turned out to be killing Mrs. Berry, for which he would split the expected $10,000 life insurance proceeds with Berry.

The subject was extensively discussed between defendant and Espinosa on November 3, 1977, the date of the murder. Defendant picked up Espinosa about 5 a.m. on that day in Severson's Cadillac. They drove to the Newhall/

---

[1]At some point, Severson married defendant. She was married to him at the time of the second trial, and is referred to in the transcript as Mrs. Humphries. For purposes of continuity we will refer to her as Cathy Severson (or Severson), the name by which she is designated in the briefs.

Saugus area in order to take care of traffic tickets issued against each of them. They were in that area until close to noon, when they began to drive back to Lomita.

On the way back, defendant renewed a discussion of the murder for hire proposed by Berry. He told Espinosa that Berry wanted his wife killed for her life insurance policy, and that he (defendant) would get half "in partnership with this Berry." Defendant told Espinosa that the policy was for $10,000, so that his share would be $5,000. He offered to pay Espinosa a net of $300 from his share for going along. Espinosa was to receive $1,000 but was to use $700 of that sum to repay a "loan" to defendant. Actually there had been no loan; defendant had spent $700 in a marijuana transaction and had told Severson that he had loaned this amount to Espinosa.

Defendant and Espinosa arrived at the Lomita apartment between 1 and 2 p.m.

Defendant drove Espinosa to his apartment in Wilmington at about 3 p.m. It was during that drive or another drive on the same day that defendant spelled out the details of the murder. He would drop Espinosa off at a party in Pomona, pick up Mrs. Berry, and return with her a few minutes later. He would pretend to spot Espinosa at a bus stop, then stop and pick him up, addressing him as an acquaintance he had not seen for a long time. Espinosa and Mrs. Berry would then engage in sex and, while her attention was diverted in that way, defendant would strangle her.

Defendant drove Espinosa to Pomona. He discussed the planned killing on the way. As Espinosa was later to testify: "He started talking about if it goes down, that you're not to say anything or something like that 'because this is a plan or something, its called premeditated,' so he said."

Defendant dropped Espinosa off at a bus stop, and said that he would return with Mrs. Berry in about 15 minutes. Espinosa had consumed thirteen to eighteen 16-ounce cans of beer during the course of the day, and had shared 8 to 10 marijuana cigarettes with defendant. He felt "a good buzz, high."

One to two hours passed before defendant returned. By then it was between 7 and 7:30 p.m. and dark, and Espinosa was upset by the delay.

Defendant drove by in the Cadillac, then stopped, jumped out of the car and greeted Espinosa as someone he had not seen for a long time. Espinosa got into the car, and sat on the passenger side of the front seat. Mrs. Berry was between him and defendant, who was driving. Defendant introduced Espinosa and Mrs. Berry, using their first names. Mrs. Berry had a shopping

list of things to buy at a store. Defendant told her to forget it, and she then asked to be taken home. She appeared to be frightened.

Defendant drove to a dead end, some 100 yards away from the nearest homes, and parked on a dirt embankment. He jumped into the back seat. Mrs. Berry again asked to be taken home, and began to cry. Defendant told her that she would first have to have sex with Espinosa who, he told her, knew about karate and would beat her up if she refused. He told Espinosa to "go for it."

By then, Mrs. Berry was crying loudly. Espinosa slapped her, and she agreed to have sex with him. She took off her glasses, shoes and coat, pulled up her dress and pulled her stockings down. Espinosa also partially undressed, but he was unable to effect intercourse and gave up. As Mrs. Berry reached down to pull up her stockings, defendant grabbed her around her throat with his right arm, pulling his forearm with his left hand. He pulled Mrs. Berry into the back seat and strangled her to death.

Espinosa then drove the Cadillac at defendant's direction to a remote area, where Mrs. Berry's body was dumped.

Her coat, purse, glasses and shoes were still in the car. Espinosa emptied the purse, and threw the contents onto planted areas alongside the freeway. He disposed of her purse, shoes and glasses in the same way. The coat was left on a fence at a school yard.

When defendant and Espinosa returned to the Lomita apartment, defendant told Severson that Espinosa had been sick in the car, and directed Espinosa to clean up the car. Espinosa, who had not been sick, returned to the car and cleaned up evidence of the killing.

He and defendant burned Mrs. Berry's identification papers over a wash basin. Espinosa had kept two items of Mrs. Berry's jewelry, but he later destroyed them. The next day, defendant and Espinosa drove to Fresno to pay a traffic ticket that had been issued to defendant and, possibly, to visit acquaintances at Folsom State Prison. They returned to the Los Angeles area the same day.

Mrs. Berry's body was discovered at 8 p.m. on November 3, lying face down next to a curb and partially unclothed. About 10:30 that evening, Berry called the Pomona Police Department and inquired whether his wife had been arrested or involved in an accident. He was later escorted to the scene, where he identified the body. He began to cry as he did so, and remained teary-eyed for some time thereafter. But by the time that he was

interviewed at a sheriff's substation several hours later, he was not crying and he appeared calm. Later that night (between 3:30 and 4 a.m. on November 4), he was seen talking and laughing in the substation coffee room.

Mrs. Berry's funeral was held on November 8, 1977. After the funeral, Berry, Mr. Steil and an insurance agent went into a room at the Steil residence to discuss the insurance. The agent informed them that Mr. Steil, not Berry, was the beneficiary. The ensuing discussion was heated. There was a further discussion at the Pomona office of the insurance company on the following day. Defendant and Berry were there. The company representative told Berry that it would take months to settle his claim. Defendant replied that it "[l]ooks like you may have to get yourself an attorney in this case." Berry waited until January 1978 to file a claim. (After the first trial, it was determined that the policy was community property, and the proceeds were equally divided between Mr. Steil, the named beneficiary, and Berry.)

A few days after the murder, defendant told Espinosa that he had been picked up for questioning, made suggestions to Espinosa about what to say if he were questioned and concluded that, so far, the police were "just fishing." In subsequent conversations, defendant told Espinosa that Berry was keeping in touch with him by telephone about the insurance proceeds. Defendant also related a conversation he had had with Berry about the police investigation. "He [defendant] told me that on that night Woodchuck [Berry's nickname] said he played it off. You should have seen it. All kinds of different things about what he said. He cried and all this."

Berry had not met Espinosa, and apparently had not been informed of his participation until after the killing. He told defendant that he wanted to meet with both of them. Defendant related this to Espinosa and the meeting took place in the Norco area some two to three weeks after the homicide.

The three first met at the home of Berry's father, then drove to a bar. Espinosa left the bar and went out to the Cadillac after a waitress had asked him for identification (he was underage to be served alcoholic beverage and had no adult identification). Espinosa fell asleep, and was awakened when Berry and defendant returned to the car. Defendant drove to a deserted area where they talked. Berry asked how the killing had been accomplished, and asked about the role of Espinosa. Defendant answered, summarizing the episode. Berry recounted that police had taken him to the location of the body, and that he had identified it and then "fell to his knees and cried; and he said that—and he also said, 'you should have seen it. I played it off real good.'"

Defendant and Berry threatened each other and Espinosa about the consequences of talking about the crime. Defendant told Espinosa that if he

said anything, "he'd get me, and if—and if Woodchuck said anything, the same." Defendant also said that he wanted his money.

This was not the first threat delivered by defendant to Espinosa. According to Espinosa, defendant had told him that "if I said anything, and that if he couldn't get me, that he'd get my father. He knew where he worked. He knew he's a longshoreman, my sister—any one of my sisters. He knew where they lived, which was at my home at the time; the school that one of them had been going to . . . He then threatened the home itself, the whole house."

One or two days after the Norco meeting, Espinosa, who was "high as a kite," was driving the Cadillac when it was involved in an accident. That car was replaced with a Buick Riviera.

Espinosa was arrested on January 11, 1978. He was allowed a telephone call from jail and spoke to his father and sister at home. Defendant was at Espinosa's home at the time. He grabbed the telephone from Espinosa's sister and told Espinosa to keep his mouth shut and to say nothing. He told Espinosa that he could not be held more than 72 hours. Police arrived at the home shortly after that. When they arrived, defendant threw the car keys he was carrying to a friend and said, "[y]ou don't know where I'm at." He ran down the hall and hid in a bedroom closet, where the police found him.

There were further conversations pertinent to the case and heard by the jury. One of them took place on February 14, 1978, about one month after the arrests. Defendant, Espinosa and Berry were being transported to the Pomona court in a sheriff's custody bus. Espinosa, who was being held in protective custody, was separated from the other prisoners. Berry yelled to defendant, "Joe, tell Rene we'll put money on his books. Tell him you'll give him your Riviera if he doesn't say anything." Defendant laughed and said, "Did you hear that?" Berry also told defendant "Don't tell him, don't tell him too much. He will run to the D.A.'s." Defendant asked Espinosa to get himself out of protective custody and into the "main line" of jail prisoners.

On another ride to Pomona in the sheriff's bus, defendant said, "Rene, listen to me, I'm going to get you. And If I don't get you, I'll get your family. I'll blow your house up. I'll get your sisters, father, everybody." Defendant also told Espinosa that the greatest punishment he could receive was a Youth Authority commitment, but that if Espinosa testified, defendant and Berry would go to the penitentiary, and they would get him. "[W]herever you go, we'll send wire out."

While in custody, defendant confessed the crime to Mark Mikles, another prisoner, and asked Mikles to put a "hit" on Espinosa.

Defendant's theory was that Espinosa had committed the crime. According to defendant, Espinosa had asked him to make arrangements with Mrs. Berry for him to have sex with her. On November 3, 1977, defendant and Espinosa drank beer and smoked marijuana with PCP. They then picked up Mrs. Berry. Espinosa dropped defendant off at a bar, and drove off with Mrs. Berry. He returned sweaty and exhausted. While driving to Fresno with defendant the next day, Espinosa said that he and Mrs. Berry had quarreled about payment for sex, and in the ensuing struggle he had killed her.

Defendant denied most of Espinosa's testimony, and denied discussing his case with Mikles.

DISCUSSION

Defendant presents eight arguments which, he urges, separately and collectively require reversal of the judgment:

1. Error in application of the pretrial stipulation.

2. Error in admission of hearsay evidence.

3. Error in instruction.

4. Error in excluding impeachment evidence.

5. Error in excluding evidence tending to establish the guilt of another.

6. Violation of the right of confrontation by undue restriction of cross-examination.

7. Ineffective assistance of counsel.

8. Prosecutorial misconduct.

These claims will be discussed in this order.

I. Application of the Pretrial Stipulation

The trial judge to whom the case had been assigned for retrial agreed to accept it under certain conditions, which were agreed to by the parties.

They concerned avoiding a repetition of motions that had been made to Judge Ronald M. George, who had presided at the first trial. The stipulation was placed on the record at a hearing conducted on May 29, 1981.

Since that stipulation is central to this appeal, we have summarized the information about it in the record in some detail. The colloquy at the May 29, 1978, hearing begins with the following statement by the trial judge: "The court agreed to take this case under certain terms and conditions; and the conditions were that we discussed Judge George's rule [*sic*] on approximately 22 motions from the previous trial, that all of those motions are contained within three volumes—four volumes that if any of these issues arise, in the retrial, we will be bound, both counsel, both sides will be bound and both counsel agree that they will be bound by every ruling that Judge George has made on any issue that has previously arisen.

"· · · · · · · · · · · · · · · · · · · · · · · ·

"I just wanted to make this clear so Mr. Humphries understands. However, if an issue arises that was not previously handled by Judge George and is a new issue at trial, then of course we will—the court will rule based on whatever facts it has and whatever the court believes the law to be." Both counsel agreed. The prosecutor stated that both attorneys had examined the content of the four volumes and were prepared to stipulate "as to all those rulings."

The court then asked who would frame the stipulation. Defendant's attorney did so. He referred to four volumes, covering proceedings conducted before trial of the first case, and continued with the following specification: "With respect to Volume I, we are prepared to stipulate that we shall be bound and the court shall be bound by the rulings contained on page 65 of volume I which is a motion under 995 of the Penal Code and page 232 of Volume I which is a hearing re amendment to the Information.

"With respect to Volume II, we are stipulating to the rulings contained on page 271, which is a supplemental finding re: a confession; 342, A-1 and A-199, which are all hearings under section 402/405 of the Evidence Code.

"Volume II, we are proposing to stipulate to the entire volume encompassing all rulings which are basically 402-405 hearings.

"On Volume IV, we again stipulate to all rulings and specifically, on my behalf, adopt the ruling on page 728.

"That is the argument as to the constitutionality of the death penalty which is mentioned.

"In other words, it would be deemed stipulated but I again raise the issue. Counsel again argues it and the court would make the same ruling." Both counsel joined in this stipulation, which the court accepted and ordered to be transcribed.

Defendant's trial attorney is now deceased. His appellate counsel argues that the stipulation is ambiguous but that the true intent of the court and counsel, revealed through subsequent rulings, was that it cover all evidentiary rulings made by Judge George, and that it was not confined to pretrial rulings. Respondent argues that it covered only pretrial rulings.

■ An examination of the text of the statements of the court and counsel at the May 29, 1978, hearing provides little comfort for defendant's position. There is a reference to "every ruling that Judge George has made on any issue that has previously arisen," but this is clearly in the context of the 22 motions contained within the "four volumes" (actually there were 6 volumes of pretrial proceedings). The prosecutor made a similar restrictive reference. Finally, and most important, the actual stipulation as framed by defendant's attorney specifically referred only to the four volumes, not to the entire trial which was reported in seventy-two volumes of transcript.

The 22 pretrial rulings included a number of *in limine* decisions favoring defendant, as well as several that favored the prosecution. Among other rulings, the court decided that confessions by defendant and Espinosa were inadmissible (although it also ruled that the inadmissibility of Espinosa's confession did not taint his testimony at trial), and that certain statements by Berry would not be received. The court also dismissed the kidnapping charge and special circumstance allegation on a Penal Code section 995 motion.

While the text and context of the stipulation appear to restrict it to pretrial rulings made before the first trial, its later treatment by defense counsel indicates that he may have understood it to cover all evidentiary rulings. The issue was not squarely presented to the court until the motion for new trial, and by then defendant had other counsel. In ruling on that motion, the trial judge stated that he had discussed the case with Judge George and had ". . . only agreed to take the case on the condition that both counsel and Mr. Humphries all agree that this court would be bound by the rulings in the four transcripts only, the pretrial rulings only 402 and only those type of ruling and that's all this court was bound to."

The new trial motion presented the issue in the context of an inconsistency between rulings of the trial judge and Judge George on the issue of when the conspiracy had ended. Judge George's ruling on that point is reported in volume 42 of the transcript of the first trial. The court responded: "When you point to volume 42 and your point is well taken, but what I meant and referred to in volume 42 in turn referred back to one of the prior rulings, they were limited to one of the prior rulings, and in no way was I going to be bound by rulings that Judge George said what was hearsay, what was not hearsay, when the conspiracy began and when it didn't begin. [¶] I have no idea how the first case was presented." The trial judge went on to explain that he relied on counsel to point out those evidentiary matters that had been the subject of a pretrial Evidence Code sections 402-405 preliminary fact hearing and ruling by Judge George.

There were several instances during the course of the trial in which the court asked whether a particular matter was covered by the stipulation. On other occasions, one or another of the attorneys argued that an issue then under discussion was covered by the stipulation. In each instance called to our attention, and in each that we have found, the trial judge ruled in accordance with Judge George's earlier ruling once it had been pointed out to him.

Defendant points to two instances in which the trial judge admitted evidence that Judge George had excluded. Neither involved an issue that had been adjudicated in an *in limine* ruling before the first trial. And in neither case did defendant's trial counsel urge that the evidence be excluded on the basis of the stipulation.

The first concerned the Norco conversations. Judge George had ruled that the mutual threat aspect of these discussions was admissible, but he had excluded other statements. by Berry as hearsay. Based on the evidence presented at the first trial, Judge George ruled that the co-conspirator hearsay exception (Evid. Code, § 1223) did not apply because the conspiracy had ended at the point of Berry's discussion with the insurance agent on November 9, 1977.

The issue of termination of the conspiracy for purposes of section 1223 had first arisen during the testimony of a prosecution witness. During a discussion at the bench, defense counsel recalled that it had been agreed at a chambers conference that the matter was excluded under the stipulation. The prosecutor agreed that this was so, and the judge deferred to their statements. The evidence at issue at that point was then excluded.

When the issue arose again, in connection with a hearsay objection to admissibility of Berry's statements at the Norco meeting, defense counsel did not reassert Judge George's ruling as a bar, and, in response to a question from the court, he said that the matter was not covered by the stipulation. The court overruled the hearsay objection on the ground that the conspiracy had not ended. As a result, Berry's statements, as related by Espinosa, were received in evidence.

Defendant points to only one other instance in which the stipulation, as he conceives it, was violated: Berry's statements on the sheriff's bus, in which he asked defendant to tell Espinosa that "we'll put money on his books," and that defendant would give him his Riviera if he did not talk. These statements were received under the adoptive admission hearsay exception (Evid. Code, § 1221). Judge George had not accepted that theory. Again, his ruling was not brought to the court's attention.

It is evident that the trial judge had not understood the stipulation to cover evidentiary rulings made during the first trial, and that he had not agreed to be bound by such rulings. A review of the extensive trial record fails to yield a single instance in which the trial court was told that Judge George had ruled in a particular way during the trial, as opposed to a pretrial proceeding.

It may be that defense counsel misunderstood the scope of the stipulation. But that misunderstanding, if it occurred, is immaterial on appeal except as to evidence to which defense counsel *failed* to object because of an adverse ruling at the first trial. If there are such instances, they are cognizable on the issue of inadequate representation of counsel. As we will point out in our discussion of that issue, no such issue has been advanced by appellate counsel.

We find no error in the application of the stipulation by the trial court.

II. Admission of Hearsay Evidence

Berry's statements at the Norco meeting about feigning grief and his statements to defendant on the sheriff's bus are challenged on the substantive ground of hearsay. We consider each statement in turn.

A. The Norco Statement

The challenged evidence is Berry's statement to defendant and Espinosa about how he had feigned grief when he was taken by police to identify his wife's body. This statement was made two or three weeks after the murder,

and after the November 9, 1977, discussion at which an insurance agent told defendant that it could take months to settle his claim for the proceeds of the life insurance policy.

Defendant's hearsay objection was overruled on the ground that the evidence is admissible under the coconspirator hearsay exception. (Evid. Code, § 1223.) ■ There are three elements of this hearsay exception. First, that the declarant's statement be made during the conspiracy and in furtherance of its objectives; second, that it be made before or during the time that the party against whom it is offered was participating in the conspiracy; and third, that the conspiracy be independently proved.

Only the first of these elements is challenged in this appeal. Defendant argues that the response Berry received from the insurance representative on the day after the funeral amounted to such a frustration of the claim as to terminate the conspiracy to collect the insurance proceeds.

Defendant relies upon *People* v. *Leach* (1975) 15 Cal.3d 419, 428 [124 Cal.Rptr. 752, 541 P.2d 296]. In that case, the Supreme Court held that where the principal object of a conspiracy is the murder of a person, the conspiracy ends when that crime is committed, and does not continue while an effort is made to collect proceeds of insurance on the life of the victim or to avoid apprehension. ■ But unlike the conspiracy discussed in *Leach,* the object of the conspiracy in this case was not murder but the collection of insurance on the life of the person murdered. In other words, the objective was monetary gain, not the removal of another person. This brings the case under the rule of *People* v. *Saling* (1972) 7 Cal.3d 844, 851 [103 Cal.Rptr. 698, 500 P.2d 610], which held that a conspiracy to collect money by doing a criminal act may continue after the act is committed. That principle remains valid under *Leach.* (*People* v. *Easley* (1983) 34 Cal.3d 858, 873 [196 Cal.Rptr. 309, 671 P.2d 813]; 1 Witkin, Cal. Evidence (3d ed. 1986) § 680, p. 664; 1 Jefferson, Evidence Benchbook (2d ed. 1982) § 3.5, p. 186.)

To be sure, *Leach* rejected the argument that a conspiracy continues so long as the participants act to avoid apprehension. But the Norco statements by Berry in this case were made well before apprehension, and while he was still trying to collect on his wife's policy.

It is significant that the insurance company representative had not rejected Berry's claim at the November 9, 1977, meeting. Instead, she had told him that the process could take months and that he might need an attorney. He filed his formal claim for the proceeds some two months after that conversation.

Defendant concedes that statements made within a few days after the murder may be admissible, but he argues that any statements made beyond that time cannot be considered in furtherance of the conspiracy. We reject such an a priori formulation, for which no authority is cited. ██ Whether a conspiracy has ended or is continuing depends upon an analysis of the facts of the case. There is no cut-off tied to a particular period of time.

When evidence is offered under the co-conspirator hearsay exception, the trial judge makes a preliminary fact decision under Evidence Code section 403, as to whether there is a sufficient basis to allow the issue to be considered by a jury. (See com. to Evid. Code § 403 by Assembly Com. on the Judiciary, quoted in Deering's Ann. Evid. Code (1986 ed.) § 403, pp. 142, 144, 29B West's Ann. Evid. Codes (1966 ed.) pp. 266, 269.) ██ We are satisfied that there is ample support for the trial judge's ruling in this case that the issue was for the jury to resolve. There was no error.

Even if we were to conclude that admission of this evidence was error, we would also conclude that the error was harmless. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 834 [299 P.2d 243].) Espinosa also testified to an earlier conversation with defendant in which the same episode was related. Thus, the jury heard about Berry's feigned grief twice: once by Espinosa's relating what he had heard Berry say, and once through Espinosa's testimony about a statement attributed to Berry by defendant. There is no challenge to the latter, or to defendant's threat to Espinosa, made at the Norco meeting.

██ Most important, all of these statements came in through the testimony of Espinosa, an eyewitness to and participant in the murder. It is not conceivable that the jury might have believed his testimony about the killing and the other Norco statements, and yet reach a different verdict if Berry's statements at that meeting about feigned grief had been excluded.

B. The Statements on the Sheriff's Bus

██ By the time Berry told defendant to tell Espinosa that they would "put money on his books" and that defendant would give him his automobile if he did not talk, the conspiracy had ended. (*People* v. *Saling, supra,* 7 Cal.3d at p. 853.) This statement was offered on the theory that defendant's response to Berry's statement was admissible under the adoptive admission hearsay exception. An adoptive admission is established when the party to whom a statement is made "with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (Evid. Code, § 1221.)

It is not necessary that the declarant of an adoptive admission expressly acknowledge the correctness of the statement made; an evasive or equivocal reply, or even silence, is the more typical reply in adoptive admission cases. (See 1 Jefferson, Evidence Benchbook, *supra,* § 3.3, pp. 174, 175.) Defendant's reply in this case, "Did you hear that?" is just such a response.

The question presented is whether Berry's statement conveyed an assertion of fact which, if adopted by defendant, might constitute an admission. The statement did not expressly state any fact. It consisted entirely of words of direction—a command that defendant make certain statements to Espinosa. But a statement may be hearsay in substance even though it is not hearsay in form. Whether it is hearsay depends on whether it implies an assertion of fact. (See *People* v. *Preston* (1973) 9 Cal.3d 308, 315 [107 Cal.Rptr. 300, 508 P.2d 300].)

The challenged statement by Berry implied that he and defendant had done something about which Espinosa's testimony could be incriminatory. In the context in which it was made (they were all traveling on the same bus to a criminal proceeding arising out of the murder of Mrs. Berry) that something was the commission of a homicide.

Of course, this is not the only inference that could be drawn from the statement. But it is reasonable to infer that Berry intended that meaning, and that defendant understood the statement in that way. This, too, is a preliminary fact determination to be made by the trial judge. Whether the incriminatory inference should be credited was for the jury to decide once the threshold requirement of admissibility had been made. (See *People* v. *Pic'l* (1981) 114 Cal.App.3d 824, 859 [171 Cal.Rptr. 106].) The same analysis is applicable to Berry's further statement to defendant, asking that he not tell Espinosa too much because he will "go run to the D.A.'s" (deputy district attorneys).

III. Error in Instructions

Defendant correctly argues that the trial court erred in failing to instruct the jury in terms of CALJIC No. 2.71.5,[2] relating to adoptive

---

[2]CALJIC No. 2.71.5:
"If you should find from the evidence that there was an occasion when the defendant, under conditions which reasonably afforded him an opportunity to reply, failed to make denial [or made false, evasive or contradictory statements,] in the face of an accusation, expressed directly to him or in his presence, charging him with the crime for which he now is on trial or tending to connect him with its commission, and if you should find that he heard the accusation and understood its nature; the circumstance of his silence [and conduct] on that occasion may be considered against him as indicating an admission that the accusation

admissions. Berry's statements on the bus were expressly received as adoptive admissions. As we have seen, they have no other relevance. While defendant's trial counsel did not request that CALJIC No. 2.71.5 be given, there is no indication that he made a tactical decision to omit it. (See *People v. Wickersham* (1982) 32 Cal.3d 307, 329 [185 Cal.Rptr. 436, 650 P.2d 311].) The instruction must be given sua sponte in any case to which it applies. (*People v. Vindiola* (1979) 96 Cal.App.3d 370, 382 [158 Cal.Rptr. 6].)

Typically, an adoptive admission is literally accusatory in form, so that it is essential that the jury be informed that it is the adoptive response, and not the accusation itself, that is to be considered against the hearsay declarant. The statement in *Vindiola* is typical: "you have killed him." In this case, however, there was no express accusation; the only adverse inference flows from the implication that defendant had committed a criminal act about which Espinosa's testimony might be harmful.

CALJIC No. 2.71.5 should have been given in this case. But in light of the context and content of the statements, the response actually made, and the fact that this evidence was presented through the testimony of Espinosa, the eyewitness to the murder, it is not reasonable to suppose that the result would have been different if the instruction had been given.

IV. Exclusion of Impeachment Evidence

Defendant assigns error in the trial court's exclusion of evidence that Espinosa had consumed PCP on prior occasions. This evidence is important, he asserts, because it would tend to show that Espinosa had consumed PCP on November 3, 1977, and, having become violent as a result of ingesting the drug, had killed Mrs. Berry.

There was a substantial amount of evidence that Espinosa was a drug user, and that he had used PCP on the date of the killing.

Defendant testified that they had shared a "dime" of PCP during the day, half of which was consumed on the way to Pomona. Cathy Severson testified that defendant and Espinosa were smoking marijuana with angel dust (PCP) at her apartment that afternoon.

---

thus made was true. Evidence of such an accusatory statement is not received for the purpose of proving its truth, but only as it supplies meaning to the silence [and conduct] of the accused in the face of it; and unless you should find that his conduct at the time indicated an admission that the accusatory statement was true, you should entirely disregard the statement."

On cross-examination, Espinosa denied using PCP on November 3. But defendant was able to establish that, at his first trial, defendant had admitted that he had "forgotten" that he had smoked PCP on that date.

The trial judge sustained an objection to a question by defense counsel, asking Espinosa if he had "ever" used PCP. Counsel attempted to justify the question at a bench conference. He pointed out that, in testimony at the first trial, Espinosa had denied using PCP on more than three occasions. The attorney stated that he would produce evidence that Espinosa had used PCP more than that. He argued that this would impeach Espinosa's credibility, and that it would tend to show that Espinosa had used PCP on November 3, 1977, and had acted irrationally as a result. Asked if he had evidence that Espinosa had used PCP on November 3, defense counsel said that he did not.

The trial court sustained the objection as improper impeachment on a collateral, and under Evidence Code section 352. ▇▇ These rulings were correct. Attempting to elicit a prior statement whose only relevance is that it would afford a basis to impeach a witness by showing that the statement was not truthful is prohibited impeachment on a collateral. (See 3 Witkin, Cal. Evidence, *supra,* § 1982, p. 1939.) And it is obvious that the fact that Espinosa had smoked PCP in the past, by itself, is not probative of his conduct on the occasion in question. (Evid. Code, § 1101, subd. (a).) Even if this evidence had some minimal probative value, the trial judge was within the proper exercise of his discretion in ruling that that value was outweighed by the consumption of time that its presentation would entail. (Evid. Code, § 352.)

Later in the trial, defendant's attorney stated that he had three witnesses under subpoena who would testify about Espinosa's use of PCP in September and October 1977. He made a detailed offer of proof about one of them, Terri Holmberg. According to this offer, she would testify that Espinosa had lived with her and her boyfriend during that time and that she had seen him use PCP as well as other drugs every day; that she had observed personality changes in Espinosa; and that he once had tried to molest her.

At another bench conference, defense counsel sought to justify this testimony as impeachment to Espinosa's claim (at the previous trial) that he had only smoked PCP on three occasions, and as evidence to prove that he had used it on November 3.

The court sustained objections on relevance and Evidence Code sections 1101, subdivision (a), and 352. It added that it would permit evidence that Espinosa had used PCP on November 3.

Insofar as this evidence was offered to impeach Espinosa's testimony at the first trial in which he denied use of PCP on more than three occasions, it was collateral, as we have seen.

Evidence Code section 1101, subdivision (a) bars evidence of criminal propensity. But section 1105 of the same code permits evidence of habit (see *People* v. *Bennett* (1969) 276 Cal.App.2d 172, 175 [80 Cal.Rptr. 706]), and this is the apparent theory of the offer of proof.

 Evidence, if believed, that Espinosa had used PCP every day for the two-month period ending three days before the murder is sufficient to permit a trier of fact to conclude that he was a habitual user, and that in conformity to this habit, he had ingested PCP on November 3. This evidence of habitual use would impeach Espinosa's denial that he had used PCP on November 3 and, taken with the testimony of defendant's medical expert, it would tend to show that Espinosa was violence-prone as a result of the PCP ingestion. We conclude that this evidence should have been admitted.

 We now consider whether its exclusion was prejudicial. We begin with the fact, acknowledged by the prosecutor in his argument to the jury, that Espinosa was the key witness. There was corroboration for his testimony, but in the end defendant would be convicted or acquitted on the basis of the degree to which the jury credited Espinosa's testimony.

There was, however, little dispute about Espinosa's use of narcotics. Both defendant and Cathy Severson testified that he smoked PCP on November 3, and Espinosa acknowledged that he had admitted such use at the first trial. In his argument to the jury, the prosecutor referred to Espinosa as a "dope fiend," and "a doper [who] may have spent the greater part of his young adult life loaded on drugs day after day, week after week."

Defendant testified that Espinosa had a "good tolerance" for PCP, better than his own, that they had both smoked about the same amount on November 3, and that Espinosa was able to walk without staggering or going into walls. "He could maintain." The amount that he consumed on November 3 "doesn't get you that high . . . [i]t doesn't zonk you out—it just gets you a high," according to defendant. On the night in question, Espinosa was "high," but not "loaded."

Defendant does not argue that the consumption of alcohol and drugs by himself or Espinosa affected the ability of either to perceive or recall the events in question. (Cf. *People* v. *Bennett, supra,* 276 Cal.App.2d 172.)

The only relevance of the ingestion is that it made Espinosa prone to violence.

Based on evidence in the record, the defense expert was asked to assume that Espinosa had consumed 18 cans of beer over a 10-hour period, had smoked a quantity of marijuana, with a "dime" of PCP, and tobacco cigarettes. The expert testified that many persons who had consumed that much would have died, and that if they did not, it would indicate long time usage.

He testified that a consumption of that quantity of drugs and alcohol is likely to result in violent behavior. But the violent propensity would be no different if the assumed quantity of alcohol, marijuana and nicotine was consumed without *any* ingestion of PCP.

Violent behavior, he said, is very common with any three of the four assumed ingested toxics (alcohol, marijuana, nicotine and PCP). "The only thing I would alter is that you might not die" if the PCP were omitted.

In light of this evidence, defendant suffered no prejudice from the exclusion of the testimony of a witness (or witnesses) who would have testified about his previous use of PCP.

## V. Evidence of Guilt of Another

Defendant argues that he should have been permitted to present evidence of Espinosa's use of PCP in aid of his theory that Espinosa committed the crime. He argues that admitting it would have corroborated his own testimony and would have established a logical explanation, similar to motive, for Espinosa's behavior.

Defendant argues that the only basis to exclude the evidence is the "*Mendez-Arline*"[3] rule, which should no longer be followed.

That rule has been repudiated by the Supreme Court. (*People* v. *Hall* (1986) 41 Cal.3d 826 [226 Cal.Rptr. 112, 718 P.2d 99].) The correct view, as articulated in *Hall* is that: "[t]o be admissible, the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. As this court observed in *Mendez*, evidence of mere motive or op-

---

[3]From *People* v. *Mendez* (1924) 193 Cal. 39 [223 P. 65], and *People* v. *Arline* (1970) 13 Cal.App.3d 200 [91 Cal.Rptr. 520].

portunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*People* v. *Hall, supra,* 41 Cal.3d at p. 833.)

Even assuming that defendant has presented the necessary "more" in this case, there is no basis for reversal on account of the excluded evidence. Defendant's argument for its admission is the same as his previous argument; the evidence would tend to show that Espinosa had ingested PCP on the day of the murder. As we pointed out in our discussion of that contention, it is unlikely that the result in the case would have been different if this additional evidence had been received. Its exclusion was harmless error.[4]

VI. Restriction of Cross-examination

A. Espinosa

Defendant sought to establish that when Espinosa signed an agreement to testify for the prosecution, he thought that he was subject to the death penalty. The court sustained objections to these questions, on the basis (among other grounds) that the answer would be irrelevant.

Since Espinosa was a juvenile when the crime was committed, he was not subject to capital punishment. (*People* v. *Davis* (1981) 29 Cal.3d 814, 827 [176 Cal.Rptr. 521, 633 P.2d 186].) It is conceded that he was aware of that fact when he testified at trial. It was his frame of mind when he testified that is critical to impeachment on the basis of a motive to lie in his testimony. His previous apprehension is irrelevant.

At any event, Espinosa was permitted to testify that when he entered a guilty plea (which he did on the same day that he signed the agreement to testify for the prosecution) his principal motive was to "save my skin. Anybody in their right mind would [have done so]." The jury was fully aware of the terms of his plea agreement, including his obligation to testify. There was no error.

---

[4]Noting that the trial court's rulings were alternatively based on Evidence Code section 352, defendant also argues that that provision should never be used to bar guilt-of-another evidence. That view was rejected in *Hall,* which held that instead of speaking of a *Mendez-Arline* "rule," "courts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible (§ 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion (§ 352)." (*People* v. *Hall, supra,* 41 Cal.3d at p. 834.)

B. Mikles

Mark Mikles testified that defendant had confessed to him that he had committed the murder. Defendant sought to establish, on cross-examination, that Mikles' testimony at the first trial had been as a rebuttal witness for the prosecution. Defendant's theory is that Mikles had agreed to testify at this late stage in the first trial because he knew that the prosecution needed his testimony, and that he could obtain especially favorable treatment on that account.

The trial court's ruling was correct. The particular juncture at which Mikles testified at the first trial was irrelevant to his testimony at the second. What was relevant is any benefit that Mikles received, or thought he would receive, as a result of his agreement to testify, and any detriment he feared if he breached that agreement. Mikles was thoroughly cross-examined on these issues. Again, there was no error.

VII. Effective Assistance of Counsel

 Defendant argues that he did not have the effective assistance of trial counsel and specifies five areas of inadequacy in the representation he received. To establish this claim, defendant "must show that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates. In addition, [defendant] must establish that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense." (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

The United States Supreme Court has observed that trial courts should be chary about second-guessing the wisdom of tactical decisions by trial counsel. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (*Strickland* v. *Washington* (1984) 466 U.S. 668, 689 [80 L.Ed.2d 674, 694-695, 104 S.Ct. 2052].)

Having these principles in mind, we turn to a review of defendant's argument that the performance of his trial counsel was constitutionally inadequate.

Defendant first claims that his trial counsel failed to properly review the transcripts of the first trial before entering into the stipulation to be bound by rulings made at that trial.

The burden of this argument appears to be that counsel failed to review each of the 72 volumes of reporter's transcript that were produced as a result of the first trial. There is nothing in the record to substantiate this claim. And, as we have seen, the stipulation as framed by defense counsel, agreed to by the prosecution and accepted by the trial court, covered only pretrial rulings made before the first trial began. There is no basis for legitimate complaint about a failure of defendant's attorney to urge Judge George's evidentiary rulings made during the course of the first trial upon the judge who presided at the second trial. No one was bound by those rulings. They were based on evaluation of the testimony given at the first trial, just as the judge who presided at the second trial based his rulings on testimony at that proceeding.

Even if defendant's trial counsel misunderstood the stipulation, or tried to expand it, defendant suffered no cognizable prejudice on those accounts.

As we have pointed out, defendant might have a claim for inadequate representation if he were to show that Judge George had committed error in ruling against him in the first trial, and that his attorney at the second trial had failed to reargue the issue because he felt himself bound by the stipulation. But defendant fails to point to a single instance of such error at the first trial.

 Defendant challenges his attorney's formulation of questions to Espinosa and Mikles. In the case of Espinosa, he argues that the questions conveyed a belief by counsel that defendant had participated in the killing of Mrs. Berry. The only support offered for this broad accusation is that counsel referred to the killing as a "murder." But the defense strategy was to shift guilt for the killing to Espinosa, not to minimize its seriousness as a homicide.

The argument about the examination of Mikles is that counsel's questions elicited the fact that both defendant and Mikles had been at the California Youth Authority at the same time. Counsel's purpose was to impeach the veracity of Mikles as a witness. This was important because Mikles had testified to a jailhouse confession of murder by defendant. Cross-examination elicited Mikles' improbable claim that he and defendant were close friends.

Counsel evidently weighed the value of impeaching Mikles against the cost that doing so would reveal that he and defendant had been at CYA.

██ Whether the value exceeded the cost is a judgment peculiarly within the competence of trial counsel, and it is precisely the kind of decision that should not be second-guessed on appeal. (See *People* v. *Pope, supra,* 23 Cal.3d at p. 424; *Strickland* v. *Washington, supra,* 466 U.S. at p. 689 [80 L.Ed.2d at pp. 694-695]; *In re Lower* (1979) 100 Cal.App.3d 144, 147, 149 [161 Cal.Rptr. 24].)

We find no support for defendant's claim of ineffective representation based on this tactical decision in the conduct of cross-examination.

Defendant's third argument is that his counsel did not renew his offer to introduce evidence of Espinosa's prior use of PCP after he had introduced evidence that Espinosa had used that drug on the day of the killing. In light of the trial court's ruling, counsel cannot be faulted for not renewing his effort to introduce it. Even if this omission were error, it did not deprive defendant of effective assistance of counsel. The omission could not have had a greater impact than the error in the original rejection of the evidence, which was harmless. And it did not deprive defendant of a defense, since evidence of Espinosa's use of PCP and other drugs was already before the jury.

██ Defendant's next claim is that his trial attorney failed to object to hearsay and leading questions in the prosecutor's direct examination of Espinosa. In support of this argument, counsel refers to 233 pages of reporter's transcript, without a single specification of an improper question. This is an inadequate argument on appeal.

The final ground asserted to show inadequacy of counsel at trial has to do with a failure to cross-examine Espinosa about an admission that he had lied in his testimony at the preliminary hearing. Defendant argues that Espinosa admitted that he lied in his preliminary hearing testimony when he testified that defendant had used the word "premeditated" in describing the planned killing of Mrs. Berry. An examination of the transcript of the first trial demonstrates that this is not so.

Espinosa testified three times about Berry's use of the term "premeditated": at the felony preliminary hearing, at the first trial, and at the second trial. It appears that in his preliminary hearing testimony, on direct examination, he had omitted to mention it during his first recounting of his November 3, 1977, conversations with defendant. On cross-examination, he was asked whether a deputy district attorney had spoken to him about it during a break in the direct examination. He denied having had such a discussion with the prosecutor.

There was a discussion of the case between Espinosa and members of the prosecutorial staff shortly before the first trial. In that discussion, Espinosa admitted that he had lied in denying the recess conversation with a deputy district attorney at the preliminary hearing. He reasserted that defendant had used the word "premeditated" in discussing the killing. This conversation was tape recorded and transcribed, and a copy of the transcript was furnished to counsel. There is no reason to doubt that defendant's counsel at the second trial was fully aware of it.

Espinosa was cross-examined about his admission at the first trial. He acknowledged that he had lied in denying the recess conversation, but he did not retreat from his testimony that defendant had used the word "premeditated."

 Whether this testimony at the first trial weakened the prosecution's case or strengthened it, or made no difference at all, is something we will never know. It was a very small part of an extremely long trial. Whether it was wise to use it again at the second trial is also debatable. But the decision not to do so is within the ambit of trial strategy and tactics left to the attorney in charge of the case. His decision did not deprive defendant of his right to effective representation.

VIII. Prosecutorial Misconduct

Most of defendant's argument about misconduct is based on the prosecutor's elicitation of evidence in violation of defendant's version of the stipulation. But no instance is cited in which the prosecutor sought to elicit evidence that had been ruled inadmissible in an *in limine* ruling before the first trial. As we have seen, the stipulation did not extend to evidentiary rulings made during any other phase of the first trial. Consequently, no impropriety is established by these questions.

Defendant argues that the prosecutor deliberately elicited perjured testimony when, in answer to his questions, Espinosa testified that defendant had referred to the planned killing as "premeditated."

 The knowing use of perjured testimony by the prosecution is improper. (*In re Imbler* (1963) 60 Cal.2d 554, 560 [35 Cal.Rptr. 293, 387 P.2d 6].) But there is no support for the claim that the prosecutor committed such misconduct. The claim is based on Espinosa's supposed admission that defendant had not used the term "premeditated." The record does not establish that admission. And Espinosa made any number of statements, under oath and in interviews, that defendant had used the term.

There is no showing that defendant's interpretation of Espinosa's tape recorded statement is the correct one; or if it is, that his version is truthful rather than Espinosa's testimony at the first trial; or, that the prosecutor knew that the trial testimony was untruthful.

Defendant faults the prosecutor for eliciting testimony from Espinosa that he and defendant visited prisoners they knew at Folsom State Prison when they travelled to the Fresno area on the day after the murder. We note, first, that this testimony did not come from Espinosa, but from a detective who recounted defendant's statement about his activities. Further, there was no objection or request for admonition with regard to these questions and testimony. A timely admonition would have cured any error. ▮ "[T]he initial question to be decided in all cases in which a defendant complains of prosecutorial misconduct for the first time on appeal is whether a timely objection and admonition would have cured the harm. If it would, the contention must be rejected [citation]; if it would not, the court must then and only then reach the issue whether on the whole record the harm resulted in a miscarriage of justice within the meaning of the Constitution." (*People v. Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468] (disapproved on other grounds in *People* v. *Hall, supra,* 41 Cal.3d at 834, fn. 3.)

Defendant's final claim is that the prosecutor's argument intimated a personal knowledge that Mikles had testified truthfully. We have reviewed the cited argument. It does not support the claim.

### DISPOSITION

The judgment of conviction is affirmed.

Hanson (Thaxton), Acting P. J., and Lucas, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 22, 1987.